The People of the State of New York, Respondent, *v.* Robert J. Sullivan, Appellant.

First Department, December 15, 1933.

*James D. C. Murray* of counsel, for the appellant.

*Felix C. Benvenga, Assistant District Attorney,* of counsel [*LeRoy Mandle, Deputy Assistant District Attorney,* with him on the brief; *Thomas C. T. Crain, District Attorney*], for the respondent.

GLENNON, J. The defendant, Robert J. Sullivan, was indicted for the crime of murder in the first degree on the 26th day of March, 1931, and entered a plea of not guilty on the following day. He was admitted to bail on June twenty-first of the same year. The trial was commenced in the Court of General Sessions on the 28th day of June, 1933; on the twenty-ninth day of June the defendant, having rested at the close of the People's case, was found guilty of murder in the second degree. The sentence provided by law was imposed by the court on the tenth day of July.

Immediately thereafter the trial judge granted a certificate of reasonable doubt.

On the 18th day of December, 1930, at about seven-thirty A. M. in a speakeasy, which was located in the premises No. 165 West Twenty-third street, one Paul Zimmer was shot. He died in the New York Hospital on the 20th day of December, 1930, as a result of a bullet wound in the neck. The defendant voluntarily surrendered on February 25, 1931, a day or two after a detective had informed his brother that he was wanted for the murder of Zimmer.

The only testimony in the record upon which the People rely to sustain the judgment is a so-called dying declaration and alleged evidence of flight. The defendant, in asking for a reversal thereof, points to the following errors, which we believe are substantial: (1) No proper foundation was laid for the reception in evidence of the statements made by Zimmer, in the absence of the defendant, at the scene of the holdup after the arrival of the police. (2) The evidence of flight, even if admissible, was insufficient to connect him with the commission of the crime. (3) The court's refusal to grant a motion for the withdrawal of a juror, after the district attorney, in opening to the jury, had made remarks which deprived the defendant of a fair and impartial trial. (4) The admission in evidence of the police alarm, which contained a description of the defendant. (5) The jury was improperly instructed by the court in answer to the question it asked through its foreman, after it had retired and had returned for further information.

We shall discuss the several assignments of error in the order in which they are given.

Charles J. Trainor, a police officer, testified, in substance, that he received a police communication between the hours of seven and seven-forty-five A. M. on the 18th day of December, 1930, over the signal box; that he proceeded to the premises and " a faint call for help came from behind the bar." When asked " was it an articulate call " or " just groaning," he answered: " Call for help, calling help." Later, on cross-examination, he said: " He hollered, he was calling for help when I went in the place." In answer thereto he went behind the bar and saw Paul Zimmer, the deceased. " I asked him did he know me? " He replied, " Yes." " I asked him his name." He answered, " Paul Zimmer." Then " I asked him if he thought he was about to die from the injury he received? " The answer was " Yes." " I then asked him if he thought he had any hopes of recovery? " He answered " No." These were the only questions asked and the only answers given which were used as a basis for the admission in evidence of the following testimony: " Q. What did he say? A. He told me three men

came in; told him stick them up.   Q. Speak up louder.   A. Three men came into the place and told him to stick them up.   *   *   *  Q. What did he say?   A. He said that three men came into the place, ordered him to stick them up; two men stood in front of the bar and one went behind the bar and emptied the cash register and turning to the two men in front of the bar said, ' Give it to him as he gave it to you,' and he shot him.   Q. What was the next question you asked him?   A. I asked him did he know him?  Q. What did he say?   A. Who it was.   Q. What did he answer?  A. And he said ' Farmer Sullivan, an ex-convict, shot me.' "

Concededly defendant was not present.   While it is true that the officer testified that blood was gushing from the neck of the wounded man, still the ambulance surgeon who arrived about the time the statement was taken was not called as a witness to give testimony which might indicate that death was imminent.

Zimmer did not ask for any members of his family or for a clergyman, or " by word or act indicate that he believed his death certain and imminent."

One might readily infer that Trainor did not believe Zimmer was going to die, since he noted at the end of the statement that the declarant was " removed to Bellevue Hospital, a prisoner for violation National Prohibition Law."   On the evening of that day after Zimmer had been removed to the New York Hospital the doctor in charge said that she did not believe the patient was going to die.

In *Shepard* v. *United States* (290 U. S. 96), in an opinion delivered on November 6, 1933, Mr. Justice CARDOZO said in part: " There must be ' a settled hopeless expectation ' (WILLES, J., in *Reg.* v. *Peel*, 2 F. & F. 21, 22) that death is near at hand, and what is said must have been spoken in the hush of its impending presence. *Mattox* v. *United States*, 146 U. S. 140, 151; *Carver* v. *United States*, 160 U. S. 553; 164 U. S. 694; *Rex* v. *Perry*, [1909] 2 K. B. 697; *People* v. *Sarzano*, 212 N. Y. 231, 235; 106 N. E. 87; 3 Wigmore on Evidence, §§ 1440, 1441, 1442, collating the decisions.   Despair of recovery may indeed be gathered from the circumstances if the facts support the inference.   *Carver* v. *United States, supra;* Wigmore, Evidence, § 1442.   There is no unyielding ritual of words to be spoken by the dying.   Despair may even be gathered, though the period of survival outruns the bounds of expectation.  Wigmore, § 1441.   What is decisive is the state of mind.   Even so, the state of mind must be exhibited in the evidence, and not left to conjecture.   The patient must have spoken with the conciousness of a swift and certain doom."

Again in *People* v. *Falletto* (202 N. Y. 494, at p. 499) Judge VANN said: " Dying declarations are dangerous, because made with no fear of prosecution for perjury and without the test of cross-examination, which is the best method known to bring out the full and exact truth. * * * Such evidence is the mere statement of what was said by a person not under oath, usually made when the body is in pain, the mind agitated and the memory shaken by the certainty of impending death. A clear, full and exact statement of the facts cannot be expected under such circumstances, especially if *the declaration is made in response to suggestive questions, or those calling for the answer of ' Yes ' or ' No.' Experience shows that dying declarations are not always true.*"

In *People* v. *Kane* (213 N. Y. 279) Chief Judge WILLARD BARTLETT said: " In several of the States of the Union the reception in criminal cases of dying declarations made under a sense of impending death, is regulated by statute. The Texas statute prescribes that in order to render declarations of the deceased competent evidence, it must be proved, among other things, that the declaration was not made in answer to interrogatories calculated to lead the deceased to make any particular statement. (Texas Code Crim. Pro. 1895, § 788.) This is doubtless the rule independent of any statutory enactment; and it applies to the statements of the wounded person in regard to his hope of recovery just as much as to his statement respecting the identity of his assailant."

William O'Connell, a fellow police officer, in substance corroborated Officer Trainor as to the statements made by the deceased. He, too, quoted the latter as saying that " Farmer Sullivan," an ex-convict, " did the shooting." On the other hand, John Grundman, a police officer who was at the scene, stated that the deceased said " a man named Farmer shot me; " that he heard no other name except " Farmer." Concededly Robert J. Sullivan, the defendant, was not an ex-convict.

We do not believe that the facts in this case were such that the court had the right to permit the jury to hear testimony which was clearly in violation of the hearsay rule, since no proper foundation was laid for its admission in evidence as an ante-mortem statement.

The so-called evidence of flight was extremely weak. Detective Bree stated that he went to 498 Washington street on the morning after the shooting. What he did there does not appear. Later he went to 403 West Forty-eighth street. There, after speaking to the janitress, he saw and talked to a woman whom he had been informed was known as a Mrs. Sullivan. When asked how many visits he made to the particular vicinity, he said: " Why, I was probably around there six to eight times, probably more." There-

after he went to the apartment house on about two or three occasions. He said the first address he had was 498 Washington street. Still the police alarm, which Detective Bree had sent out, shows that the last known address of defendant was 498 Sullivan street. Much ado is made by the People of the fact that the formal statement, which was taken in the Magistrates' Court at the time defendant was arraigned therein, set forth the address of defendant as 498 Washington street. Bree would not deny that he had given that address to the clerk. He said, " I don't know whether I done it or he done it," and then having been asked, " Did he look at the paper before he signed it?" he answered, " Well, I cannot recall whether he read over or he just signed it."

There is no evidence in the record to indicate that this defendant left the jurisdiction or concealed himself during the period between the time the crime was committed on December eighteenth and February twenty-fifth, when he appeared at the police station. There was no testimony which established that defendant actually resided at any of the addresses mentioned.

It will be noted that the statement taken by Officer Trainor designated the person who fired the shot as Farmer Sullivan, an ex-convict. This defendant was not an ex-convict. In opening to the jury the district attorney said in part: " Now, gentlemen, I want to tell you in all sincerity that I do not want you to give any particular or special attention to the word ' ex-convict.' It is not brought in here with any intent to be unfair to this defendant in this particular case; as a matter of fact, he is not an ex-convict; he has had his trouble with the Police Department and was known in the neighborhood as a man in trouble with the police on numerous occasions." That statement was highly prejudicial. Defendant's motion for the withdrawal of a juror should have been granted. To assert of a man charged with the crime of murder in the first degree that " he has had his trouble with the Police Department and was known in the neighborhood as a man in trouble with the police on numerous occasions " had a natural tendency to make the jury believe that the defendant was a man of ill repute.

We now pass to the error of the court in charging the jury. The record discloses that the jury retired at two-fifty P. M. After they had deliberated for two hours, the following communication was received from the foreman of the jury: " Are we permitted under the law and testimony to deduce that when Detective Bree went to the hospital to interview Zimmer and afterwards returned with photographs, that these were identified by Zimmer, as Sullivan, the man who shot him, thus causing Bree to send out an alarm for Sullivan."

On their return the court read the question submitted to him and replied: " Well, gentlemen, if you want a categorical answer to that, my answer would be yes. And I may say that you are entitled under the law and logic to make any deduction that appeals to you as logical and reasonable. So you may make that deduction if you see fit."

In answering " Yes," as he did, instead of " No," as he should have done, the court fell into error. There was no evidence in the record of the fact that Zimmer had identified the photographs as " Sullivan, the man who shot him." Bree went to the hospital and showed certain pictures to Zimmer. He did not say that the patient identified the photographs as those of the defendant. If he had made such a statement, it would have been hearsay. By no stretch of the imagination could it have been classified as a dying declaration, since the detective said that he made no attempt at that time to take a dying declaration as the circumstances indicated that the deceased then was not in imminent danger of death. Furthermore, as we have seen, the doctor said she did not think Zimmer was going to die. The question as framed clearly indicated that the answer thereto would probably determine in the minds of the jury the guilt or innocence of this defendant.

For these reasons we believe that the judgment should be reversed and a new trial ordered.

O'MALLEY and TOWNLEY, JJ., concur.

MARTIN, J. (concurring). I vote to reverse for the reason that a serious error was made by the court in instructing the jury in answer to a question with reference to identification.

The court answered a question in the affirmative which should have been answered in the negative. Upon that answer the jury evidently determined the guilt of the defendant.

The matter under consideration was the identification by Zimmer of a photograph of Sullivan, the man accused of the shooting. There was no proof in the record that the wounded man identified the photograph as that of Sullivan, the defendant. There was no evidence from which that might be deduced. This was a very important subject and one upon which the jury was entitled to an instruction that there was no evidence that the wounded man had identified the photograph of the defendant.

It was clearly indicated by the jurors that the answer was important and would probably determine in their minds the guilt or innocence of the defendant.

FINCH, P. J., concurs.

Judgment reversed and a new trial ordered.